IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Kimberly W., | ) |
|     Plaintiff, | ) ) ) |
| | ) Case No.: 20-cv-50055 |
| v. | ) |
| | ) Magistrate Judge Margaret J. Schneider |
| Kilolo Kijakazi, | ) |
| Commissioner of Social Security,[1] | ) ) |
|     Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

    Plaintiff Kimberly W. brings this action under 42 U.S.C. § 405(g) seeking a remand of the decision denying her social security benefits. The parties have consented to the jurisdiction of the Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons stated below, Plaintiff's motion for summary judgment, Dkt. 27, is granted, the Commissioner's motion for summary judgment, Dkt. 34, is denied, and the decision of the ALJ is reversed and remanded.

**BACKGROUND**

A. Procedural History

    Plaintiff filed an application for disability insurance benefits on June 16, 2014. R. 187-88. On May 13, 2016, ALJ Patricia Kendall held a hearing at which vocational expert James Radke testified. R. 40-77. On November 1, 2016, the ALJ ruled that Plaintiff could perform sedentary work with various restrictions. R. 24. The ALJ noted that her fibromyalgia, postural orthostatic tachycardia syndrome ("POTS")[2], and arthritis were not so severe that they could preclude a limited range of sedentary work. R. 26. In furtherance of her conclusion, the ALJ relied on the fact that Plaintiff could manage a range of daily activities including taking care of her personal care needs, preparing quick meals, performing chores, and traveling by herself. R. 30. She rejected the December 2014 opinion of Dr. Barakat, Plaintiff's treating physician, based on the lack of severe limitations in his treatment notes and the conservative course of her care. R. 27.

    After exhausting administrative appeals, Plaintiff filed an appeal in this Court. In January 2019, then-Magistrate Judge Johnston remanded the case on the basis that the ALJ did not provide

---

[1] Kilolo Kijakazi has been substituted for Andrew Saul. Fed. R. Civ. P. 25(d).
[2] POTS is a disorder of the autonomic nervous system which causes a very fast heart rate (tachycardia). The main distinguishing symptoms of POTS are a rapid increase in heartbeat, fainting, dizziness, and fatigue. *Postural Orthostatic Tachycardia Syndrome (POTS)*, JOHNS HOPKINS MED., https://www.hopkinsmedicine.org/health/conditions-and-diseases/postural-orthostatic-tachycardia-syndrome-pots (last visited July 27, 2021).

a proper analysis in evaluating the opinion of Dr. Barakat. R. 800. Judge Johnston explained, "the ALJ . . . impermissibly cherry-picked evidence with regards to whether Dr. Barakat's opinion was supported by his treatment notes. This is not only an error at Step One, but also when discussing the checklist factors at Step Two . . . [T]he ALJ failed to evaluate, either implicitly or explicitly, *all* of the checklist factors, several of which favored Plaintiff." R. 799.

On remand, ALJ Kevin Vodak held a new hearing on October 4, 2019. R. 741-71. Dr. Arnold Ostrow and vocational expert Heather Mueller testified. *Id.* Dr. Ostrow endorsed Plaintiff's POTS, cervical degenerative disc disease, hearing loss, fibromyalgia, and Huntington's disease but did not find Plaintiff's Huntington's disease to be particularly severe prior to October 2017. R. 725. He also did not find that the IV infusions were an effective treatment for Plaintiff's POTS. R. 729. Additionally, he opined that Plaintiff could only occasionally reach in all directions due to her cervical degenerative disc disease. R. 730. On December 2, 2019, the ALJ issued his ruling finding that Plaintiff could do light work subject to restrictions. R. 723. The ALJ relied largely on similar evidence and rationales, except with some additional factual material added based on Dr. Ostrow's opinion. Plaintiff now seeks review of the ALJ's December 2, 2019 decision, which stands as the final decision of the Commissioner. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

B. Factual Background

1. Medical Evidence[3]

In 1996, Plaintiff developed POTS which made her quite ill. R. 392. She had previously treated with Zoloft medication, which, as of August 2013, she had stated helped control her symptoms of low mood and energy. *Id.* She also has a history of fibromyalgia, hypercholesterolemia, and degenerative disc disease, as well as chronic joint pain. R. 393, 401. On April 3, 2014, Plaintiff saw rheumatologist, Dr. Sunita Penmatcha. R. 374. Dr. Penmatcha found that her TPO antibodies suggested that she would most likely develop autoimmune thyroid disease, and that her primary care physician should check her TSH levels yearly or sooner for suggestions of hypothyroidism. *Id.* She noted that Plaintiff presented with diffuse joint pain and recommended that she exercise. *Id.*

From April 2014 through March 2016, Plaintiff treated with Dr. Suheil Barakat for fatigue, weakness, and dehydration generally associated with POTS. On May 27, 2014, Plaintiff presented for a follow-up, complaining of chronic fatigue, weakness, and dehydration. R. 411. Dr. Barakat assessed that she was having more severe and frequent symptoms or fatigue and weakness, and recommended that she return to the office for an IV infusion. R. 413. On July 29, 2014, Plaintiff returned to Dr. Barakat for evaluation of her continuing fatigue, muscle aches, and joint discomfort. R. 534. Dr. Barakat noted that Plaintiff's fatigue was persisting, although she did not appear to be dehydrated, and reported that her POTS was stable at that time. *Id.* He recommended that she continue a low-fat diet and exercise. *Id.* On August 19, 2014, Plaintiff again presented to Dr. Barakat complaining of fatigue. R. 530. Dr. Barakat found that her thyroid-stimulating hormone (TSH) level was 5.7 and that it had been climbing. R. 531. He recommended that she

---

[3] This section is a summary of Plaintiff's medical history that is relevant to this appeal and does not represent Plaintiff's entire medical history.

2

return for IV fluids, and prescribed Crestor and ordered a lipid profile. *Id.* On October 20, 2014, Plaintiff again presented with complaints of fatigue. R. 525. Dr. Barakat found that her TSH was at therapeutic levels and recommended that she return for an IV saline infusion, remain on a low fat, low cholesterol diet, and continue with the Crestor. R. 526.

On January 8, 2015, Plaintiff returned to Dr. Barakat complaining of feeling weak and tired. R. 567. Dr. Barakat found that she was dehydrated and noted an issue with her blood pressure. *Id.* He again recommended that she follow up for IV fluids and noted to monitor her hypothyroidism. *Id.* On April 14, 2015, Plaintiff again treated with Dr. Barakat and reported feeling tired. R. 654. Dr. Barakat noted that she was dehydrated, and that saline would be infused. *Id.* He also noted that her fatigue was related to her dehydration. *Id.* In addition, regarding her hypercholesterolemia, he reported that she had not been taking her statin and that she should resume it immediately. *Id.* On July 6, 2015, Plaintiff again presented feeling dehydrated and Dr. Barakat ordered her normal course of IV fluids. R. 644-47. On August 17, 2015, Dr. Barakat noted that Plaintiff had reported she was feeling tired most of the time but stated that she did not appear dehydrated. R. 643. Regarding her hypocholesterolemia, he found her LDL to be 171 and recommended that she continue her diet, increase her prescription of Crestor, and exercise. *Id.* On March 15, 2016, Dr. Barakat reported that Plaintiff's POTS was controlled, though she presented with fatigue and generalized aches. R. 668.

On January 6, 2015, Plaintiff again saw Dr. Barakat and complained of feeling weak and dehydrated. R. 633. Regarding her hypercholesterolemia, Dr. Barakat noted that her LDL levels were down and encouraged her to continue with exercise. *Id.* As to her hypothyroidism, he found her TSH levels to be 2.1 and recommended that she continue with the same dosage of Synthroid. *Id.* For her POTS, he prescribed another course of IV infusion. *Id.*

On March 16, 2016, Plaintiff presented to Dr. Trevor Tennant with a complaint of right wrist, hand, forearm, and elbow pain as well as severe cervical discomfort. R. 672. Dr. Tennant noted that Plaintiff first noticed the pain six months prior. *Id.* Following a complete history and examination, Dr. Tennant noted cervical disc dysfunction complicated by degenerative disc disease and degenerative joint disease. R. 675. Dr. Tennant provided chiropractic care including electrical stimulation, and recommended EMS therapy as well as stretching and exercise. R. 677. On April 26, 2016, Plaintiff returned for treatment with Dr. Tennant, complaining of frequent aching and tightness in her lower neck and low back. R. 709. From June 2016 to October 2016, Plaintiff received chiropractic therapy for continual symptoms of radiating neck pain. R. 1451-1472. On August 29, 2016, Plaintiff had an MRI of her spine, which showed a loss of lordosis centered at C5-6, as well as loss of disk height, a tear of the annulus, and disk herniations at C5-C6 and C6-C7. R. 1013. On November 3, 2016, Dr. Hiroyuki Oya found that EMG results showed symptoms consistent with right-sided carpal tunnel syndrome. R. 1054.

2. Hearing Testimony

At the administrative hearing on October 4, 2019, Plaintiff testified that she stopped working in May of 2014 due to her POTS. R. 747. She stated that her POTS was under control with her treatment, which required four-hour infusions every several months. R. 748. She testified that she had chronic fatigue and dehydration, which caused her to have trouble speaking at times.

R. 748-49. She stated that she had issues with position changes, which would lead to brain fog and dizziness. R. 749. She also testified to her history of fibromyalgia. *Id.* This would cause her to have body aches, joint pain, and muscle pain. R. 750. Though she was taking Flexeril, she had to go off of it because it could exacerbate her Huntington's disease. *Id.* In addition, she stated that she was having severe arthritis in her right hand. *Id.* She also testified regarding her hypothyroidism, which resulted in extreme fatigue on a daily basis. R. 751. Plaintiff stated that she would have difficulty sitting for more than an hour because she would need to move due to her fibromyalgia and back pain. *Id.* She also stated that she could walk approximately one block, could stand for about 15 to 20 minutes at most, and that her lifting was limited to about ten pounds due to a bulging disc issue. R. 752. As to her daily activities, Plaintiff remarked that she would do a little housework throughout the day and would rest in the afternoons. R. 754. She was able to drive and interact with her grandchildren but not partake in physical activities with them. *Id.*

Dr. Ostrow also testified as the medical expert at the hearing. R. 756-62. She found that Plaintiff's functional impairments included POTS, Huntington's disease, degenerative disc disease, hearing loss, and fibromyalgia. R. 758. She stated that, prior to October of 2017, Plaintiff's Huntington's disease was not severe. R. 759. Based on the medical records, she found that Plaintiff had the residual functional capacity to lift 15 pounds occasionally and ten pounds frequently, stand and walk for two hours in an eight-hour workday, and sit for six hours in an eight-hour workday. R. 759. She also found that Plaintiff could not raise her upper extremities above shoulder height bilaterally, could only occasionally push, pull, or reach in all other directions, could climb stairs occasionally, but could not climb ropes, ladders, or scaffolding, and was precluded from working at unprotected heights or open bodies of water, or with rapidly moving or dangerous equipment. R. 759-60. Dr. Ostrow also opined that if Plaintiff's physician found that she was dehydrated, then the administration of IV fluids was appropriate, though she found it to be an unsatisfactory process that she wasn't sure was necessary. R. 761.

The vocational expert also testified at the hearing. R. 765. The ALJ asked the vocational expert to imagine a hypothetical individual, with Plaintiff's age, education, and work experience. R. 766-67. The ALJ then asked the expert to further assume that the individual is able to perform the full range of light work activity except could only occasionally reach overhead bilaterally and frequently reach in other directions bilaterally; to reduce her standing and walking to no more than four hours out of an eight-hour workday; to assume that she could only occasionally push or pull, or climb ramps or stairs; never climb ladders, rope or scaffolds; only occasionally balance, stoop, kneel, crouch, and crawl; never be exposed to unprotected heights or moving mechanical parts; and only be exposed to moderate level of noise. R. 767. The vocational expert testified that such an individual could perform the veterans coordinator position as performed, even with the limitation of only lifting or carrying 15 pounds and standing or walking two hours of the eight-hour workday. R. 768. However, if the individual could only occasionally reach in all directions bilaterally, the vocational expert found that that would eliminate all past relevant work and there would be no ability to transfer skills. *Id.* In addition, if the individual were to be absent two times per month, that would also preclude all jobs. R. 769.

3. The ALJ's Decision

In his written decision denying Plaintiff's claim for benefits, the ALJ went through the five-step analysis for determining whether a person is disabled under the Social Security Act. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity. R. 720. At step two, the ALJ found that Plaintiff had the following severe impairments: POTS, fibromyalgia, degenerative disc disease of the cervical spine, and sensorineural hearing loss bilaterally. R. 720. At step three, the ALJ found that Plaintiff had no impairment or combination of impairments meeting or medically equaling the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 722.

The ALJ proceeded to step four to find that Plaintiff had the residual functional capacity (RFC) to perform light work except that she could only lift/carry 15 pounds occasionally, and 10 pounds frequently, stand/walk 2 hours in an 8-hour workday; occasionally push/pull bilaterally, occasionally reach overheard bilaterally, and frequently reach in other directions bilaterally; could never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; and occasionally balance, stoop, kneel, crouch, and crawl. R. 723. An individual's RFC is the most one can do in a work setting despite the limitations. 20 C.F.R. § 416.945(a). Light work involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 416.967. The ALJ also found that Plaintiff could never work at unprotected heights or near moving mechanical parts, could occasionally be exposed to vibration, and be exposed to no more than a moderate level of noise. *Id.*

Turning to the medical opinions, the ALJ gave great weight to the opinions of the State agency medical consultants, finding that they were generally consistent with the evidence available at their time of review. However, the ALJ noted that he assessed additional limitations to accommodate for Plaintiff's cervical degenerative disc disease.

The ALJ also assessed two work status notes and a medical opinion by Plaintiff's treating physician, Dr. Barakat. The ALJ gave only partial weight to Dr. Barakat's opinion because he found that the work-related limitations were not fully explained or supported by Dr. Barakat's treatment notes, objective findings, or other evidence of record. The ALJ also gave more specific reasons. In his work status note dated December 15, 2014, Dr. Barakat noted that Plaintiff "experiences most of the noted symptoms; however, his treatment notes document no significant evidence of fainting, headache, shakiness, nausea, or chest pain, and the record reflects no emergency medical visits for treatment or otherwise documents such symptoms during the relevant period." R. 728. In a note from July 2014, Dr. Barakat noted that every one or two months, Plaintiff would feel tired and weak and that with the administration of IV fluids she would feel better, but Plaintiff testified to receiving fluids approximately every three months and not every one or two months as the note suggested. R. 729. In addition, the administration of fluids was more frequent in 2014, and Dr. Ostrow doubted the need for the infusions. *Id.* Lastly, during the period at issue, "the claimant's physical examination and neurological examination findings are also generally within normal limits . . . and inconsistent with limitations" given by Dr. Barakat. *Id.*

5

Meanwhile, the ALJ gave significant weight to the opinion of medical expert, Dr. Ostrow, because he had the opportunity to review the entire medical health record and his reasoning was well-supported by objective medical evidence. R. 730. Notably, however, the ALJ gave little weight to his opinion that Plaintiff could only occasionally reach in all directions, "as both the treatment record and prior hearing testimony support a finding that the claimant's condition improved with chiropractic treatment and she was able to engage in activities such as lifting her grandchildren." *Id.*

Finally, regarding opinions related to Plaintiff's mental limitations, the ALJ gave great weight to the opinions of the State agency psychological consultants since they were "overall consistent with the evidence of record." R. 730.

## STANDARD OF REVIEW

The reviewing court reviews the ALJ's determination to establish whether it is supported by "substantial evidence," meaning "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Moore v. Colvin*, 743 F.3d 1118, 1120-21 (7th Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Substantial evidence is "more than a mere scintilla." *Wright v. Kijakazi*, No. 20-2715, 2021 WL 3832347, at * 5 (7th Cir. 2021). "Whatever the meaning of 'substantial' in other contexts, the Supreme Court has emphasized, 'the threshold for such evidentiary sufficiency is not high.'" *Id.* (quoting *Biestek v. Berryhill*, __U.S.__, 139 S.Ct. 1148, 1153 (2019)). As such, the reviewing court takes a limited role and cannot displace the decision by reconsidering facts or evidence or by making independent credibility determinations, *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008), and "confines its review to the reasons offered by the ALJ." *Green v. Astrue*, No. 11 CV 8907, 2013 WL 709642, at * 7 (N.D. Ill. Feb. 27, 2013).

The court is obligated to "review the entire record, but [the court does] not replace the ALJ's judgment with [its] own by reconsidering facts, re-weighing or resolving conflicts in the evidence, or deciding questions of credibility. [The court's] review is limited also to the ALJ's rationales; [the court does] not uphold an ALJ's decision by giving it different ground to stand upon." *Jeske v. Saul*, 955 F.3d 583, 587 (7th Cir. 2020). The court will only reverse the decision of the ALJ "if the record compels a contrary result." *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021) (citations and quotations omitted). Additionally, "[a]n ALJ need not mention every piece of medical evidence in her opinion, but she cannot ignore a line of evidence contrary to her conclusion." *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014) (citing *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012)).

## DISCUSSION

In the present appeal, Plaintiff advances two main arguments for reversing or remanding

the decision. First, Plaintiff argues that the ALJ erred in giving only partial weight to Dr. Barakat's opinion. Second, Plaintiff argues that the ALJ erred in failing to weigh the November 2017 opinion of Dr. Nopoulos.

   A. Dr. Barakat's Opinion

Plaintiff argues that the ALJ erred in giving treating physician, Dr. Barakat's opinion only partial weight, which she claims ran afoul of the treating physician rule. "For claims filed before March 2017, a treating physician's opinion on the nature and severity of a medical condition is entitled to controlling weight if it is well-supported by medical findings and consistent with substantial evidence in the record." *Johnson v. Berryhill*, 745 F. App'x 247, 250 (7th Cir. 2018) (citing 20 C.F.R. 404.1527(c)(2)). An ALJ must provide "good reasons" for discounting the opinion of a treating physician. *See Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011). If an ALJ does not give a treating physician's opinion controlling weight, she must then determine what value it merits. *See* 20 C.F.R. § 404.1527(c); *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011). In assigning that value, the ALJ must "consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); 20 C.F.R. § 404.1527(c). "While we will not vacate or reverse an ALJ's decision based solely on a failure to expressly list every checklist factor, we do expect the ALJ to analyze the treating source's medical opinion 'within the multifactor framework delineated' in the regulation." *Ray v. Saul*, 861 Fed. Appx. 102, 105-06 (7th Cir. 2021) (internal citation omitted); *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010) (finding that generally acknowledging the regulatory factors is sufficient).

The ALJ gave multiple explanations for assigning only partial weight to Dr. Barakat's opinion.[4] The ALJ concluded that "many of the restrictions provided by Dr. Barakat are without explanation and not fully supported by Dr. Barakat's own treatment notes or other evidence or record." R. 728. The ALJ further stated that Dr. Barakat's opinion deserved less than controlling weight because Dr. Barakat indicated that Plaintiff's fatigue would improve after the administration of fluids; therefore, the record does not support unscheduled work breaks or absences. R. 729. Regarding the IV infusions, the ALJ noted that Dr. Barakat's records stated every one or two months, Plaintiff would begin to feel tired and weak and would require IV fluids, whereas the administration of fluids occurred both more and less frequently depending on the time period. *Id.* The ALJ also cited to physical and neurological examination findings within normal limits to find that the limitations of walking only one block, sitting for only 1 hour, and walking 0 hours, as well as other movement restrictions, were inconsistent. *Id.*

The ALJ's reasoning for finding Dr. Barakat's opinion not supported by the medical record was based on an unfair comparison of Dr. Barakat's opinion with the medical record as a whole. The ALJ impermissibly chose a handful of treatment notes to discredit Dr. Barakat's opinion without discussing the larger number of treatment notes that were consistent with the opinion. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("An ALJ has the obligation to consider all

---

[4] As set forth in the initial remand order, Dr. Barakat's 2016 physical assessment (R. 664-65) is the only medical opinion by Dr. Barakat in the record that warrants review. *See Kimberly L.W. v. Berryhill*, No. 17 C 50281, 2019 WL 354980, at *11-12 (N.D. Ill. Jan. 29, 2019).

7

relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding.")

One key example of the ALJ focusing on one line of medical evidence while ignoring other, far more relevant, medical evidence was the ALJ's conclusion that "the claimant's physical examination and neurological examination are also generally within normal limits . . . and inconsistent with limitations of walking only one block, sitting for only 1 hour, and walking 0 hours." R. 729 (citing R. 374, 401, 523, 565, 615, 1043). The records that the ALJ cited to in support of this statement are citations to isolated statements in these medical records that Plaintiff had a normal physical or neurological exam within more extensive visit documentation that reveal significant medical issues present at each examination. For example, the ALJ cites to 28F/3 (R. 1041), which is a page from records of an October 6, 2016, visit to the University of Iowa hospital where Plaintiff was seen in connection with ongoing monitoring of her Huntington's disease diagnosis. On that page, the records report that her physical exam showed that she had full strength in her upper and lower extremities. However, the records from the visit as a whole show that she has a host of physical problems, including "right hand numbness and neck pain," "difficulty with gait, as well as difficulty with dropping things over the last few months" and an "active problems" list that included "other malaise and fatigue." R. 1041-43.

Other records cited by the ALJ in support of this proposition show a similar pattern. The ALJ cited to 17F/3 (R. 565), which are records from a January 8, 2015 examination of Plaintiff by Dr. Barakat. The notes of the physical exam do not include any abnormalities, but that observation disregards the fact that Plaintiff was seeing Dr. Barakat for treatment for POTS and under "Chief complaint," the records state, "PT [patient] here for evaluation prior to IV therapy for dehydration." R. 565, 567. Under Assessment, the records state, "Patient is becoming dehydrated . ... have her return in a.m. for IV fluids." R. 567. The ALJ did the same thing with respect to 14F/10 (R. 523). Plaintiff visited Dr. Barakat on October 20, 2014, with complaints regarding POTS and was assessed with "fatigue with POTS syndrome," and Dr. Barakat concluded, "Patient is to return in a.m. for IV saline infusion." R. 526. The ALJ used this record as a citation for Plaintiff having normal physical and neurological examinations. R. 729. The ALJ also cited to 4F/21 (R. 401). This was a visit to the University of Iowa hospital on May 20, 2014. Of note in these records, it is reported that Plaintiff "has had severe joint pain in her hands, elbows, shoulders, knees and hips for three years. In addition, she reports muscle aches in her arms and hips toward the end of the day. . . . In addition to the pains described above, she reports generalized weakness as the day goes on." *Id.*

The ALJ also criticized the timing and frequency of the administration of IV fluids and the fact that in a July 7, 2014 treatment note, Dr. Barakat stated that the IVs would be administered every one to two months. R. 729 (citing R. 537). The ALJ found it problematic that contrary to this statement, the IV fluids were instead administered in slightly different intervals, sometimes two months apart, sometimes three months apart, sometimes longer. *Id.* Yet, the ALJ does not explain why the fact that the Plaintiff's needs varied slightly from what was initially anticipated means that Dr. Barakat's opinion regarding Plaintiff's abilities is not entitled to controlling weight. Similarly, the ALJ provided no explanation as to how the rate of Plaintiff's infusions or her subsequent temporary improvement undermines Dr. Barakat's findings as to her ongoing chronic symptoms. While the ALJ notes that Dr. Ostrow doubted that IV infusions were an effective

8

treatment, Dr. Ostrow also opined that episodes of dehydration associated with POTS would be consistent with the work absences needed. R. 760-61. Without further explanation, it is not clear how the failure to undergo IV infusions on a more constant basis is inconsistent with Dr. Barakat's opinion that on a recurring basis, Plaintiff would feel fatigued and would benefit from the administration of intravenous fluids.

The ALJ then found that Plaintiff's fatigue would improve after the administration of fluids, thus negating the need for unscheduled work breaks or absences and thereby undercutting Dr. Barakat's opinion. R. 729. This finding ignores the fact that in July 2014, after Plaintiff had already stopped working for two months, Dr. Barakat noted that Plaintiff was generally feeling tired and weak and sleeping 10-12 hours per day to be able to function. R. 586. Yet, this was an improvement in her condition since being off work. *Id.* Dr. Barakat further noted that the IV fluids "usually have her regain her strength back" but "[g]radually, her condition would start deteriorating and she would soon start fee[l]ing, weak and tired." *Id.* Dr. Barakat concluded, "With this condition, she is unable to perform the duties of her regular occupation." *Id.* The ALJ mischaracterized Dr. Barakat's records to make it appear that the IV fluids allowed Plaintiff to achieve full wellness, rather than a temporary fix to allow her some level of wellness at times while generally feeling fatigued. *See also* 567, 573-75, 579-80, 582-83, 585-86.

The ALJ also took issue with Dr. Barakat's limitations as to handling, fingering, and reaching based on "symptoms primarily affecting her right upper extremity." R. 729. Notably, Dr. Ostrow agreed that Plaintiff could only occasionally reach in all directions due to her cervical degenerative disease, but this is the only aspect of Dr. Ostrow's opinion that the ALJ gave "little weight". R. 730. The ALJ noted that these limitations were not consistent with other evidence of record given "improvement of symptoms with chiropractic treatment, and her ability to pick up her grandchildren with minimal discomfort." R. 729 (citing R. 709). The ALJ further remarked that at a November 2016 medical appointment it was noted that she "maintained full strength in her upper extremities . . . despite EMG findings consistent with right-sided CTS [carpal tunnel syndrome]." *Id.* Again, the ALJ was not permitted to "cherry-pick" from Plaintiff's medical records to find examples to undercut Dr. Barakat's opinion regarding Plaintiff's limitations. *Denton*, 596 F.3d at 425. The first statement regarding Plaintiff's improvement with chiropractic care and ability to pick up her grandchildren comes amid multiple reports of various types of neck and back pain during a weekly visit to a chiropractor. R. 709-712. The second statement about full strength in upper extremities is preceded by notes about the fact that she has numbness in her entire right hand as well as "neck pain with pain radiating down her right shoulder." R. 1053.

Therefore, the ALJ's decision at step one that Dr. Barakat's opinion did not deserve controlling weight is not supported by substantial evidence.

The decision to remand is also supported by the fact that the ALJ further erred in his analysis at step two of the treating physician rule. Because the Court finds that the ALJ erred in finding Dr. Barakat's opinion to be inconsistent with the medical evidence of record, the Court will only briefly describe the errors at step two. The Commissioner admits that the ALJ did not apply the checklist factors explicitly but argues that the ALJ conducted an implicit analysis. The Court acknowledges that an implicit analysis may suffice as long as the ALJ analyzes "the treating source's medical opinion 'within the multifactor framework delineated' in the regulation." *Ray*,

9

861 Fed. Appx. at 105-06. However, the ALJ failed to adequately address the checklist factors, even under a more deferential approach. Dr. Barakat was Plaintiff's primary care physician and their relationship spanned at least 5 years with opinions from 2011, 2014, and 2016. R. 26-27, 273, 562, 664-65. The ALJ only cursorily referred to the length and nature of the treating relationship, and did not state how, if at all, he factored the extent of the relationship into the determination to give only partial weight to the opinion. "Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion." 20 C.F.R. § 404.1527(c)(2)(i). The ALJ's failure to address this and other checklist factors without further analysis further demonstrates how the decision at step two was not supported by substantial evidence.

The failure to follow the requirements of the treating physician rule may not be considered harmless, as Dr. Barakat opined that Plaintiff would only be able to walk 1 block, sit for only 1 hour, walk for 0 hours, and could only occasionally reach in all directions. R. 729. At the hearing, the vocational expert opined that the limitation of only occasionally reaching in all directions bilaterally would eliminate all past relevant work and would preclude any jobs at the light level. R. 768.[5] Accordingly, the weight accorded to Dr. Barakat's opinion could be outcome determinative. In light of the above, the Court finds that a remand is warranted.

B. Dr. Nopoulos' Opinion

Having found that remand is warranted on the issue of the treating physician's opinion, the Court finds it unnecessary to determine whether the ALJ's failure to consider Dr. Nopoulos' opinion was erroneous. However, the Court notes that while an ALJ may discount a treating opinion if it does not address the correct time period, it should be appropriately considered. *Eichstadt*, 534 F.3d at 667 ("But it is evident from the ALJ's decision that she did not 'fail to consider' this evidence, but instead she examined it as required and subsequently concluded that the evidence was irrelevant, because it did not address the correct time period.")

## CONCLUSION

For the reasons stated above, Plaintiff's motion for summary judgment is granted, the Commissioner's motion is denied, and the decision of the ALJ is reversed and remanded.

Date: January 25, 2022                    ENTER:

                                                    *Margaret J. Schneider*
                                              United States Magistrate Judge

---

[5] The Court reiterates that Dr. Ostrow echoed this opinion, which the ALJ rejected for the same cherry-picked reasons discussed above. R. 730.